# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

JOHN W. LINDSTROM,

          Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

          Defendant.

No. C07-3050-MWB

**REPORT AND RECOMMENDATION**

---

## I. INTRODUCTION

The plaintiff John W. Lindstrom seeks judicial review of a decision by an adminis-trative law judge ("ALJ") denying his application for Title II disability insurance ("DI") benefits. Lindstrom claims the ALJ erred in failing to develop the record fully and fairly and in evaluating his credibility. (*See* Doc. No. 7)

## II. PROCEDURAL AND FACTUAL BACKGROUND
### A. Procedural Background

On November 12, 2003, Lindstrom protectively filed an application for DI benefits, alleging a disability onset date of September 17, 2002. (R. 112-14). Lindstrom claims he is disabled due to bipolar disorder and anxiety attacks. He claims these conditions prevent him from working because he is unable to get along with others and he will "get into arguments, get depress[ed], [and] stress out." (R. 132)

Lindstrom's application was denied initially and on reconsideration. (*See* R. 59, 60) Lindstrom requested a hearing, and a hearing was held on September 8, 2005, before Administrative Law Judge ("ALJ") Ralph Wampler. Lindstrom was represented at the hearing by attorney Kenneth Johnson. Lindstrom testified at the hearing, and Medical Expert Douglas Brady also testified. (R. 296-419) On October 13, 2005, the ALJ issued an

unfavorable decision, finding that although Lindstrom was disabled when alcoholism was considered, absent his alcoholism, he was not disabled and was able to perform his past relevant work. (R. 61-72) Lindstrom appealed the ALJ's ruling, and on March 23, 2006, the Appeals Council reversed the ALJ's decision and remanded the case for further proceedings. Specifically, the Appeals Council found the ALJ had failed to follow established protocol with regard to the effect of Lindstrom's alcoholism on his disability; failed to make a full and proper evaluation of Lindstrom's credibility; and failed to evaluate the opinions of the state agency medical consultants. (R. 103-06)

Following the remand, a hearing was scheduled for June 27, 2006, before ALJ George Gaffaney. Lindstrom's attorney Kenneth Johnson appeared and requested a continuance, advising the ALJ that Lindstrom's car had broken down some sixty miles from the hearing location. The ALJ agreed to reschedule the hearing. (*See* R. 420-27)

On August 15, 2006, ALJ Gaffaney held a hearing attended by Lindstrom, his attorney, and Vocational Expert ("VE") Marian Jacobs. Lindstrom and Jacobs testified at the hearing. (R. 428-63) On December 18, 2006, the ALJ issued an unfavorable decision, finding Lindstrom retains the residual functional capacity to perform jobs that exist in significant numbers in the national economy, and he therefore is not disabled. (R. 10-21) Lindstrom appealed this decision, and on May 22, 2007, the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner. (R. 6-9)

Lindstrom filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 1) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Lindstrom filed a brief supporting his claim on December 30, 2007. (Doc. No. 7) The Commissioner filed a responsive brief on February 28, 2008. (Doc. No. 8) Lindstrom

elected not to file a reply brief. (Doc. No. 9) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Lindstrom's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Lindstrom's hearing testimony

#### a. September 8, 2005, hearing

At the time of the hearing, Lindstrom was living alone in an apartment in Kamrar, Iowa. He was born in 1953, making him fifty-two years old at the time of this first hearing. He quit high school during his senior year, and got a G.E.D. He served in the Navy from 1972 to 1973, presumably working as a Boatswain's mate.[1] (R. 399)

Most of Lindstrom's work experience has been spent doing factory, maintenance, and labor types of work. He last worked in September 2002. He is "on a 100% non-service connected VA disability," which began in approximately November 2003. (R. 400) He receives $848 per month in VA disability payments. (*Id.*)

Lindstrom stated his primary disabling condition is related to his mental health. He gets anxiety or panic attacks during which he feels like he is going to pass out, and he feels weak and begins to shake, both inside and outside. (R. 401-02) Being around people can precipitate such attacks, so he spends most of his time alone. He estimated he has a panic attack about once a month. (R. 402-03) Each panic attack lasts ten to fifteen minutes. After the panic attack ends, he feels weak and drained, and he has to lie down or sit and rest for the remainder of the day. (R. 404)

Lindstrom used to live at the YMCA, and he would only leave his room to eat or use the restroom. He now lives alone in an apartment, and he leaves home very seldom. He goes shopping for groceries once a week, and he visits his sister, who lives about ten minutes away, for about half an hour twice a week. Otherwise, he stays home. (R. 405) He has no friends and is unable to maintain relationships. When he used to be around people and try

---

[1]The transcriptionist listed the job as "Boltsman [phonetic] mate." (R. 399)

to date women, he always ended up becoming verbally abusive, and he frequently got into physical altercations.  (R. 406-07)

Lindstrom also has problems with his mind racing, and paranoid thoughts that others are talking about him.  He plays video games to keep himself from thinking about things.  He tends to upset himself, which makes his stomach tighten up and hurt.  Because his mind races, he has problems with concentration and memory.  (R. 407-09)  Although he believes he has a high energy level, he lacks motivation to do anything and spends most of his time just sitting.  (R. 409-10)  He does not have suicidal thoughts, but he has had homicidal thoughts at times, especially when he was over-medicated.  (R. 410)  He believes his mental condition would prevent him from completing a normal eight-hour workday.  (R. 411)

### b.    *August 15, 2006, hearing*

At the beginning of the hearing, the ALJ reviewed Lindstrom's past relevant work as set forth by the VE.  (*See* R. 205-06)  Lindstrom's past jobs include maintenance engineer, forklift operator, small products assembler, heat treater, mixer operator, hog sticker, and chipper grinder.  The VE also listed "injection molder," but Lindstrom clarified that he did not run an injection mold; rather, he inspected parts after they came out of the mold.  (R. 431-33)  However, he indicated his last job, which ended in September 2002, was "doing molding, making table counters."  (R. 437)  The job ended after Lindstrom threatened his supervisor.  He received unemployment compensation for six or eight months after he quit working.  (R. 441)

Lindstrom stopped drinking alcohol five months prior to the hearing.  He quit using marijuana about a month prior to the hearing.  Before then, he was using marijuana every day, and drinking almost every day.  (R. 438-39)

Lindstrom's anxiety attacks apparently had increased in frequency and intensity since his first ALJ hearing.  At this hearing, he stated he had anxiety attacks three to four times a week, and the attacks lasted longer and were more intense than they were when he was still

4

using alcohol and marijuana. When he has an anxiety attack, he experiences "uncontrolled shaking," and he feels light-headed and like he is going to pass out. (R. 441-42)

Lindstrom has problems dealing with people. He gets very angry, shakes, and yells. He has a nephew, Josh, who is "the only one who really comes around and sees [him]," because Josh understands that despite how angry Lindstrom appears to be, Lindstrom will not hit him. According to Lindstrom, outsiders observing his behavior would think he was going to kill someone. (R. 442-43) He is taking medication that helps keep his mind from racing, but he still becomes angry quickly at anyone who is around him. He believes he cannot work, in part, because he is "afraid [he is] going to hurt someone." (R. 449) To control his environment, he stays at home, only going out for groceries, to check the mail, and to see doctors at the VA (R. 445-47) He stated his hygiene is poor, and he sometimes goes several days without showering or shaving. (R. 447)

Lindstrom stated he has difficulty concentrating, and his medication affects his concentration and gives him "cotton mouth." (R. 448-49) The medication leaves him "tired and forgetful." (R. 450) He stated he would be unable to perform any type of work because his medication prevents him from remaining focused. (R. 451) He often thinks people are plotting against him, and he has problems communicating with others. He stated, "I wouldn't even want to work with me." (R. 452)


## 2.    *Lindstrom's medical history*

On August 4, 2003, Lindstrom was seen at the Veterans Administration's Central Iowa Health Care System in Des Moines, Iowa, requesting medical clearance to enter a substance abuse treatment program. He reported using alcohol and marijuana the previous day. He was found medically stable for outpatient detox. (R. 336-38) On August 6, 2003, he was admitted into a residential treatment program. Admission notes indicate Lindstrom was homeless and unemployed, he was self-referred, and he had no family or other significant individual willing to participate in his treatment. He indicated he had been

through substance abuse treatment three times previously, in 1974, 1981, and 1990. (R. 330, 334-35) He told the staff he had "a real bad alcohol and marijuana [problem]." (R. 334) He also reported using methamphetamine in the past, most recently seven months earlier. (R. 331) He described several arrests and legal problems relating to his substance abuse, and stated he had spent several years in prison. (R. 323) He complained of problems getting along with others, and "trouble controlling violent behavior." (R. 324)

Lindstrom was treated with medications, and was started on an exercise program for general conditioning. On September 4-5, 2003, he was noted to be having problems with aggression, impulsivity, and controlling his temper. His medications were adjusted. (R. 314-15) He continued to have difficulties controlling "his hostile actions and his inability to let go of issues that are not in his control." (R. 309) He was depressed but not suicidal, and stated "he was ready to go off on staff if they [did not] leave him alone." (R. 309) He felt the staff had disrespected him and could not be trusted. The counselor's notes indicate Lindstrom "displayed no ability to internalize what is said to him or accept any responsibility for control of his actions." (*Id.*) Lindstrom agreed to a mental health referral for depression. (R. 307)

On September 15, 2003, Lindstrom was seen for a psychiatric consultation and evaluation by David L. Bethel, D.O. (R. 299-304) Lindstrom described himself as a "child drunk," and stated he had experienced problems with his temper dating back to childhood. A mental status examination revealed that Lindstrom needed to shave, and he talked at an overly loud volume. Otherwise, his examination was within normal limits. (R. 301-02) Anger management classes were recommended, and his current psychotropic medications (Depakote, Buspar, and Trazodone) were continued without change. (R. 303) He was not considered to be a danger to himself or others. (R. 306)

Lindstrom apparently was admitted to the VA medical center on October 2, 2003, for treatment of alcohol dependence, with history of polysubstance abuse and alcohol-induced mood disorder, and to rule out intermittent explosive disorder. (R. 296) On October 6, 2003,

he was discharged from acute care and transferred to a residential facility for continued treatment. (*Id.*) At the time of his transfer, David A. Orea, M.D. opined Lindstrom was "unable to pursue gainful employment and . . . currently unable to provide adequately for [him]self in the community." (*Id.*)

On November 10, 2003, Lindstrom requested discharge from the treatment program. He planned to work in his home community of Kamrar, Iowa, and to live with his sister until he could get HUD housing. He had made good progress during treatment in dealing with his anger and stress, and he expressed an understanding that he should not consume alcohol or other drugs, legal or illegal, that could interfere with his improvement and be detrimental to his health. (R. 294-95) Upon discharge, his medications were Buspirone HCL, an anti-anxiety medication, 20 mg three times daily; Clonazepam, used to treat anxiety and panic disorders, 10 mg once daily; Clonidine HCL, a blood pressure medication, .2 mg once daily; Clotrimazole cream, used to treat certain skin conditions and rashes, among other things; Depakote, used to treat bipolar disorder, 500 mg twice daily; ibuprofen, an anti-inflammatory analgesic, 600 mg three times daily as needed for aches and pains; pseudoephedrine HCL, 30 mg four times daily as needed for congestion; and Seroquel, also used to treat bipolar disorder, 100 mg four times daily.[2] (R. 292) The doctor's discharge summary indicates Lindstrom had "reached maximum improvement possible [and] his Alcohol Induced Mood Disorder [had] stabilized sufficiently to permit outpatient treatment." (R. 290) Lindstrom was noted to have complied well with his overall treatment plan and medication regimen, and his mental status examination was within normal limits in all criteria. (R. 290-91)

Lindstrom was seen for outpatient followup on November 17, 2003. He was "upset" because he thought the appointment time was for him to see a doctor instead of a nurse. He reported sleeping poorly, and remaining inactive. He denied feeling depressed or suicidal, and stated he had maintained his medication regimen since his discharge from residential treatment. (R. 279) His medications were continued, and he was scheduled for followup in

_____

[2]Information on prescribed medications is available at www.rxlist.com.

three months.  (R. 279-83)  A nurse attempted to reach Lindstrom on November 18, 2003, for followup on how he was doing, but he could not be reached.  (R. 278)  In a phone call on December 1, 2003, Lindstrom reported he was still unemployed, and he was planning to return to the Des Moines area to try to obtain employment because the small community of Kamrar offered limited employment opportunities.  He had relapsed and used alcohol the previous week and did not have any interactions with an AA sponsor.  He stated, "That's another reason I need to return to the Des Moines area.  I need to get into AA and really get involved."  (R. 277)

On December 16, 2003, Lindstrom was seen in the emergency room with complaints of nausea and diarrhea after reportedly eating some unrefrigerated pork hotdogs.  He was staying at a YMCA.  He was treated with IV fluids and was discharged from the ER in stable condition.  (R. 253)

On January 9, 2004, Lindstrom was seen in the emergency room with complaints of pain from his shoulders down to his elbows bilaterally for eight days.  He reported the pain would increase with activity and when he slept at night.  He could not recall doing anything strenuous that would have caused the pain, but "wonder[ed] if he may have slipped and [fallen]."  (R. 247)  He was treated with an injection of Toradol, and was discharged in stable condition.  (R. 248)  He reportedly was unemployed and living in Des Moines.  Besides his shoulder pain, he felt "fine."  (R. 247)

Lindstrom was seen on January 15, 2004, for followup of his bilateral shoulder pain. Notes indicate his diagnosis was probable bursitis.  He still had pain in both shoulders, but the pain was getting better.  Lindstrom's current medications were continued, including 600 mg of ibuprofen three times daily as needed for pain.  In giving his history, Lindstrom reported drinking four beers on New Year's Day.  He stated his mood was "pretty even," with no suicidal ideation.  (R. 242-46)

On January 20, 2004, DDS consultant Carole Davis Kazmierski, Ph.D. reviewed the record and completed two Mental Residual Functional Capacity Assessment forms regarding

Lindstrom - one to indicate his abilities while he is drinking and using other substances (R. 207-10), and one to indicate his abilities while his substance abuse is in remission (R. 212-14). Dr. Kazmierski evaluated Lindstrom under Listings 12.04, Affective Disorders; 12.08, Personality Disorders; and 12.09, Substance Addiction Disorders. She noted Lindstrom's mental status evaluation "showed problems with anger control, but other aspects of mental status functioning were generally within normal limits." (R. 211) She concluded that although Lindstrom "does have some moderate restrictions in social functioning related to his personality disorder and problems with anger management," he is able to tolerate "brief, superficial dealings with others when it is in his own interests to do so," and "[o]ther aspects of work-related functioning do not appear to be significantly impaired when [he] is sober and abstinent." (R. 211) Another DDS consultant reviewed the record on March 1, 2004, and concurred in Dr. Kazmierski's conclusions. (R. 214) Another medical consultant reviewed the record on March 30, 2004, and concurred, as well. (R. 240-44)

Lindstrom was evaluated by a physical therapist on February 20, 2004, and physical therapy treatment was scheduled for his shoulders. Lindstrom reported that his pain was along the lateral shoulders, radiating to the elbow. It was worse with arm elevation and when he slept. Physical therapy sessions were scheduled twice weekly, and he was instructed in home exercises. (R. 389-91)

Lindstrom was seen on February 27, 2004, for a nutritional evaluation and education session. He was noted to be "motivated to make some changes in food choices, portion sizes and exercise routine to promote improved lipids." (R. 388) He stated he would begin walking regularly and attempt to change his eating habits. (R. 389)

Lindstrom attended his physical therapy sessions and took his medications as directed. At a general medical follow-up appointment on March 12, 2004, he stated he was "doing well but [was] troubled by arthritis in shoulders. Doing well emotionally." (R. 378) On June 4, 2004, Lindstrom reported that he felt good except for ongoing pain in his shoulders. (R. 369)

On June 4, 2004, Lindstrom met with a social worker through a VA program for homeless veterans. He reported feeling trapped and isolated at the YMCA. He stated he had purchased a vehicle recently, and he planned to relocate to Webster City, Iowa, "and live in his car." (R. 368) On June 9, 2004, the social worker met with Lindstrom in Webster City and assisted him in locating housing. The social worker noted Lindstrom "displayed positive social skills and interacted well with individuals within the community." (*Id.*) On June 8, 2004, Lindstrom apparently moved back in with his sister in Kamrar, Iowa. (R. 364) Notes indicate he was "not depressed," had "good animation," and was not using drugs. He continued to complain of some arthritis pain in his shoulders. (R. 364)

On June 18, 2004, Lindstrom was given a depression screening test that was positive. He agreed to accept a mental health referral for depression. (R. 367) Lindstrom was seen in the mental health service on September 22, 2004. He reported that a month earlier, due to lethargy, he had stopped taking all of his medications except Seroquel. He stated he was "tense." Long-term goals of his treatment were to level his mood, increase his productivity and activities, and develop more tolerance of pain. (R. 360-62) He stated he was depressed at times, but he did not have mood swings. (R. 359) He was assessed with a substance-induced mood disorder and alcohol dependence, mood disorder due to medical problem, antisocial personality disorder, and arthritis in shoulders. His Global Assessment of Functioning (GAF) was 45.[3] (R. 359-60)

On November 7, 2004, Lindstrom underwent an eight-hour battery of neuro-psychological testing and evaluation by David F. Dettmann, Ph.D., Neuropsychologist. (R. 353-57) Lindstrom indicated he was unemployed. He stated his general health was good and he had no significant health problems. He gave a history of depression and mood problems since at least age fourteen, stating he often was "hyped and depressed, with my mind racing,

---

[3]A GAF of 45 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Morgan v. Commissioner of Social Security*, 169 F.3d 595, 598 n.1 (9th Cir. 1999).

I'm always doing stuff." (R. 354) He described difficulties with his short-term and long-term memory. Lindstrom's test results were considered valid. He was cooperative, chatty, appropriately groomed, and exhibited a normal rate of mentation. "Psychomotor functioning was grossly normal, although somewhat clumsy and relatively inefficient for dominant right hand." (R. 355) His affect was appropriate and his speech was fluent and adequately articulated. "Abilities were generally good for a variety of structured and unstructured tasks. Self-monitoring and correcting abilities were good." (*Id.*) Dr. Dettmann's impressions after evaluating all of the testing were as follows:

> Present neuropsychological data is consistent with a mild dementia due to persisting alcohol abuse. The difficulties noted in visual memory and learning, visual perception and visual constructional abilities, as well as in his reduced ability for visual construction and initial immediate detailed verbal memory, as well as reduced ability in understanding logical sequences of behavior, are consistent with the documented substance abuse. Mr. Lindstrom has adequate neurocognitive resources for competency needs and vocational activity if his substance abuse is managed. He has adequate ability to benefit from therapy and treatment programs using verbal modalities, but may at times have some rather unusual perspectives or solutions. He was responsive to general consequences and feedback, and has the ability to benefit from abstract concepts such as metaphors, analogies and proverbs, although may need some guidance and assistance. He appears to learn with repetition of information; however, given his difficulties with visual information, he should be encouraged to verbally describe and encode visually presented materials.

(R. 357)

Lindstrom failed to appear for a mental health clinic appointment on January 21, 2005. He called the clinic on March 15, 2005, to report that he had been having problems with his back for two weeks, but nurses were unable to reach him to return his call. He failed to keep another appointment on April 15, 2005. (R. 352-53)

### 3. *Medical expert's testimony*

At the September 8, 2005, hearing, clinical psychologist Douglas Brady testified as a medical expert (ME). He reviewed Lindstrom's medical records, which he summarized as follows:

> There's a diagnosis of substance induced mood disorder and it's pretty documented both in the VA, primarily through VA medical records. The claimant has had difficulty with alcohol and alcohol withdrawal. He did have a neuropsychological evaluation, which in the most recent exhibit I have, . . . that was done on November 7, 2004, at the request of the VA because of this claimant's difficulty with these aggressive outbursts and also his difficulty, as he's mentioned, with his thinking and . . . ideas and so forth. He has long term history of fighting. He has had episodes of lost consciousness. He's had episodes of significant electric shock. And he's had difficulty with these energy outbursts and so forth. He has had delusional patterns. The neuro psychologist felt they were primarily related to his substance abuse. The neuropsychological results showed that the claimant has a pattern consistent with a mild dementia due to persisting alcohol use. And the neuro psychologist . . . felt that the claimant had adequate neuro . . . resources for being competent in vocational activity if his substance abuse was managed. However, the claimant has had out of control substance abuse primarily alcohol.

(R. 412)

The ME stated Lindstrom's current mental health problems were caused by dependence on and abuse of alcohol and other drugs, and he opined that even if Lindstrom were to stop using completely, he likely still would have the mental problems because he has damaged his brain. (R. 413) In the ME's opinion, Lindstrom likely would meet or equal Listing 12.02, organic mental disorders, even if he stopped abusing substances. However, the ME indicated he lacked sufficient information to state that conclusion as a certainty. (R. 414-16)

The ALJ indicated that because Lindstrom's mental impairments cannot be separated from his substance use or abuse, he would consider the substance use/abuse to be a contributing factor to Lindstrom's disabling condition. (*See* R. 416-18)

### 4. *Vocational expert's testimony*

At the August 15, 2006, hearing, VE Marian Jacobs identified Lindstrom's past relevant work as molding machine operator, unskilled, sedentary to light physical demand level as Lindstrom performed the job; maintenance engineer, semi-skilled, medium to heavy physical demands as Lindstrom performed the job; forklift operator, semi-skilled, light physical demand level as Lindstrom performed the job; small products assembler I, unskilled, light exertion level; heat treater II, semi-skilled, light to medium exertion level as Lindstrom performed the job; mixer operator, semi-skilled, light to medium exertion level as Lindstrom performed the job; hog sticker, semi-skilled, medium exertion level; and grinder-chipper II, semi-skilled, heavy exertion level. (R. 197-98, 453-54)

The ALJ asked the VE hypothetical questions considering an individual who is fifty-three years old, with an eleventh grade education and a GED:

> The first one would limit work to simple, routine, more than simple, routine but not complex, semiskilled work, with frequent changes in a routine work setting and frequent independent decisions, occasional interaction with the public, frequent interaction with coworkers and supervisors, occasional exposure to hazards such as heights and moving parts. I'm concerned about side effects from his medication here. With this residual functional capacity, could the past relevant work be performed?

(R. 455) The VE indicated the hypothetical individual could perform Lindstrom's past work as a mixer operator, hog sticker, molding machine operator, chipper-grinder, small products assembler, and maintenance engineer. The VE indicated the jobs of forklift operator and heat treater would not be appropriate for the individual given the hazards involved in those jobs. (R. 455-56)

The ALJ posed a second hypothetical involving the same person, with "just occasional exposure to hazards and this would be simple, routine tasks with occasional changes in routine work setting and occasional independent decisions, no interaction with the public and occasional interaction with coworkers and supervisors." (R. 456)  With those restrictions, the ALJ opined none of Lindstrom's past relevant work could be performed.  (*Id.*)

The ALJ asked the VE to consider an individual of Lindstrom's age, education, and work experience, with "no physical demand limits other than the hazards." (R. 457)  The VE indicated this individual could perform "some solitary jobs," including document preparer of microfilming materials, laundry folder, newspaper deliverer, and night stocker.  (*Id.*)

The ALJ asked the VE to consider the same individual with occasional exposure to hazards; simple, routine tasks; no changes in routine work setting; no independent decisions; no interaction with the public; occasional interaction with coworkers and supervisors; and unable to sustain an eight-hour workday.  The VE indicated this individual would be unable to work at full-time, competitive employment.  (R. 458)

On questioning by Lindstrom's attorney, the VE indicated that if an individual had mental health problems that prevented him from completing tasks in a timely manner on an occasional basis up to one-third of the time, the individual would be unable to work.  Further, if the individual had a weekly outburst or created some type of disturbance during his interactions with coworkers and supervisors, or if he was unable to have contact with the public, supervisors, and coworkers, he would be unable to work.  Also, if the individual missed two or three days of work per month, he would be unable to work.   (R. 460-61)

**5.**    ***The ALJ's decision***

The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2.      The claimant has not engaged in substantial gainful activity since October 18, 2002, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.      The claimant has the following severe combination of impairments: substance induced [] mood disorder; antisocial personality disorder; alcohol dependence/polysubstance abuse by history (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except that he can occasionally work in areas of hazards. He is able to do only simple, routine tasks. He may occasionally be exposed to changes in a routine work setting. He may occasionally engage in independent decision-making. He should avoid contact with the public. He can occasionally interact with coworkers and supervisors.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on March 20, 1953 and has been defined as a younger individual and as an individual closely approaching advanced age (20 CFR 404.1563).

8.      The claimant has at least a high school equivalent GED and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from October 18, 2002 through the date of this decision (20 CFR 404.1520(g)).

(R. 15-20)

In assessing Lindstrom's residual functional capacity from a mental standpoint, the ALJ gave "a good deal of weight" to Dr. Dettmann's neuropsychological evaluation of Lindstrom that took place on November 7, 2004. (R. 17; *see* R. 353-57) He also relied on Dr. Kazmierski's records review, and on the medical expert's hearing testimony. (R. 17-18) The ALJ found that Lindstrom's degree of mental impairment varies depending on whether or not he is using alcohol or other substances, and when he is sober, Lindstrom's mental status functioning is within normal limits. He further observed that Lindstrom's long gaps in treatment were evidence that his course of treatment was effective in improving his symptoms. (R. 27-29) The ALJ further noted Lindstrom's "fair work history," which he found evidenced an ability to perform substantial gainful activity "despite an antisocial personality disorder." (R. 19) Based on the opinions of the various medical sources, the ALJ found Lindstrom's allegations concerning the existence, persistence, and intensity of his symptoms and functional limitations not to be fully credible. (*Id.*)[4] The ALJ gave no weight to the fact that Lindstrom began receiving a disability pension award from the Veterans Administration beginning October 2003, noting Lindstrom had "not shown that the VA's rating or decision under its system is the equivalent to a finding of disability under the Social Security Act." (*Id.*, citing 20 C.F.R. § 404.1504; *Fisher v. Shalala*, 41 F.3d 1261, 1262 (8th Cir. 1994)).

The ALJ relied on the VE's testimony in determining that although Lindstrom cannot return to any of his past relevant work, he retains the residual functional capacity to perform

_____

[4]The ALJ also indicated Lindstrom "did not appear at the hearing to support his allegations." (R. 18) This finding was erroneous. Lindstrom was unable to attend one hearing due to unexpected car trouble. The hearing was rescheduled, and Lindstrom appeared and testified at the hearing. However, it does not appear the ALJ based his conclusions regarding Lindstrom's residual functional capacity on his appearance, or failure to appear, at a hearing.

work that exists in the local and national economies, including document preparer, laundry folder, newspaper deliverer, and night stocker. (R. 20) He therefore found that Lindstrom is not disabled. (*Id.*)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not

severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20

C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20

C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ,"

*Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432

(8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)).  As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)     the claimant's daily activities;
> 2)     the duration, frequency and intensity of the pain;
> 3)     precipitating and aggravating factors;
> 4)     dosage, effectiveness and side effects of medication;
> 5)     functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984).  *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).  The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## *IV.  DISCUSSION*

Preliminarily, the court notes Lindstrom claims he became disabled as of September 17, 2002; however, the first medical evidence of record is from August 2003, and Lindstrom has offered no evidence to prove he became disabled as of the date alleged.  As the DDS consultant noted, medical evidence prior to August 2003 "is insufficient" to determine that Lindstrom was disabled at any time prior to that date.  (R. 211)

Lindstrom argues the ALJ erred in failing to develop the record fully and fairly because although the ALJ acknowledged Lindstrom had been found disabled by the VA, the ALJ failed to obtain a copy of the VA's "decision or underlying evaluations" leading to the VA's disability determination.  Lindstrom agrees the Commissioner is not bound by the VA's

disability determination, as the ALJ noted in his decision. However, he argues the ALJ had a duty to consider the rationale for the VA's decision.

A disability determination by another agency is not binding on an ALJ. *See Jenkins v. Chater*, 76 F.3d 231, 233 (8th Cir. 1996) (citation omitted). However, "a VA finding of disability is important enough to deserve explicit attention in the ALJ's determination." *Tollefson v. Barnhart*, No. C04-0046-JAJ, Doc. No. 12, slip op. at 11 (N.D. Iowa Jan. 18, 2005). In the present case, the Commissioner argues the ALJ complied with his duty to develop the record because he "both recognized that [Lindstrom] received disability pension benefits from the VA and explained why he was not bound by that determination." Doc. No. 8, p. 12 (citing R. 19). The ALJ noted the following regarding Lindstrom's VA disability pension:

> The claimant has received a disability pension award from the VA, beginning October 2003 [citation omitted]. The undersigned attributes no weight to the notice. The claimant has not shown that the VA's rating or decision under its system is the equivalent to a finding of disability under the Social Security Act. 20 CFR 404.1504; *Fisher v. Shalala*, 41 F.3d 1261, 1262 (8th Cir. 1994).

(R. 19) The Commissioner argues this was enough, and "the ALJ clearly considered the VA's disability rating and concluded that he was not bound by it." (Doc. No. 8, p. 13)

Merely acknowledging the fact that Lindstrom was awarded a VA disability pension does not comply with the ALJ's duty to develop the record fully and fairly, particularly in this case, where the claimant's *only* medical evidence of record is from VA providers and there appears to be a dearth of evidence regarding the claimant's mental impairments. Although the available evidence suggests the ultimate disability determination by the Commissioner may not change even after reviewing the rationale behind the VA's disability determination, nevertheless the ALJ had a duty to develop the record fully and fairly, despite Lindstrom's representation by counsel. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). Unlike the ALJ in the remand of

claimant Tollefson's case, *see Tollefson v. Astrue*, No. C07-0015-JSS, slip op. at 19-20 (N.D. Iowa March 7, 2008), the ALJ here did not discuss the rationale behind the VA's disability determination, or apply the Social Security Administration's disability criteria to the VA's factual findings. The undersigned recommends this case be remanded for further development of the record with instructions for the ALJ to obtain and properly consider the VA's disability determination.

Lindstrom also argues the ALJ erred in failing to obtain a "comprehensive consultative psychological evaluation" in which the evaluator specifically considers the effects of Lindstrom's recognized impairments on his ability to work. He asserts that although Dr. Dettmann opined, from his neuropsychological evaluation, that Lindstrom is able to work, that bald conclusion is not supported by a recitation of any work-related limitations. The undersigned agrees that Dr. Dettmann's evaluation, standing alone, is insufficient evidence to support the ALJ's determination of Lindstrom's mental residual functional capacity.

Lindstrom also argues the ALJ improperly evaluated his credibility based on the standards set forth in *Polaski*. He argues the ALJ "insisted" that Lindstrom failed to appear at his hearing to support his claim, and "[t]his appears to be a major factor in the ALJ's decision." (Doc. No. 7, p. 16) As noted *supra* at note 4, although the ALJ's finding was in error, it does not appear to the court that the ALJ relied to any degree on this finding. Rather, it appears the ALJ relied heavily on Lindstrom's failure to obtain treatment for his mental impairments consistently, or to obtain treatment at all from approximately November 2004 to July 2006. Nevertheless, the ALJ failed to address the bulk of Lindstrom's subjective claims regarding his inability to deal with people, even on a limited basis, and his other mental problems he believes would prevent him from working. When presented with a hypothetical question consistent with Lindstrom's subjective claims, the VE indicated he would be unable to work. There is nothing in the record to affirmatively refute Lindstrom's

claims, and the ALJ had a duty to identify and discuss inconsistencies in the evidence that led him to find Lindstrom's claims to be less than credible.

The Commissioner "agrees that if the Court determines [the] ALJ failed to adequately develop the record, conduct a proper credibility analysis, or obtain sufficient medical evidence for a proper RFC determination, the proper remedy is remand to allow the Commissioner to correct the deficiencies in the ALJ's decision." (Doc. No. 8, p. 19) The undersigned finds remand for further proceedings is the appropriate remedy in this case.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[5] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed, judgment be entered for Lindstrom, and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for further development of the record consistent with this opinion.

**IT IS SO ORDERED.**

**DATED** this 18th day of August, 2008.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[5]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.